# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JOHN P. VIGIL,

      Plaintiff,

v.                                        CV 11-0158 WPL/RHS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## MEMORANDUM OPINION AND ORDER

The Social Security Administration ("SSA") deemed Plaintiff John P. Vigil disabled from October 14, 1987, when he was still a child, until April 1, 2005. (Administrative Record ("AR") 769.) In 2005, the SSA reevaluated Vigil's eligibility for benefits and found that he had medically improved and was no longer disabled. (AR 345, 367.) Vigil's appeal from that decision ultimately brought this case before me. Vigil has filed a Motion to Reverse or Remand (Doc. 23), the Commissioner of Social Security has responded (Doc. 24), and Vigil has replied (Doc. 25). Pursuant to 28 U.S.C § 636(c) and FED. R. CIV. P. 73(b), the parties consented to have me serve as the presiding judge and enter final judgment. After having read and carefully considered the record, pleadings, and relevant law, I find that the Commissioner's decision is not supported by substantial evidence and remand the case for further proceedings consistent with this Order.

### STANDARD OF REVIEW

The standard that courts apply in reviewing the Commissioner's decision is the same regardless of whether the issue is termination of benefits or the initial denial of benefits. *See Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994). I must determine whether the decision is supported

by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Id.* I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See id.*

### SEQUENTIAL EVALUATION PROCESS

Where continuation of benefits is at issue, as with an initial disability determination, the court applies a sequential evaluation process. However, unlike the initial determination, the sequential evaluation process applicable to the termination of benefits consists of up to eight steps. 20 C.F.R. §§ 404.1594(f), 416.994(b)(5). In another variation from the initial evaluation process, the burden in termination cases rests with the Commissioner at each step.[1] *Hayden v. Barnhart*, 374 F.3d 986, 988, 990-91 (10th Cir. 2004) (citations omitted). If the Administrative Law Judge ("ALJ") finds that the claimant is unable to engage in substantial gainful activity at any point, then she will not proceed through the remaining steps. 20 C.F.R. §§ 404.1594(f), 416.994(b)(5).

At the first two steps, the ALJ considers the claimant's current work activity and the severity of his impairment or combination of impairments. *Id.* The ALJ next asks whether there has been

---

[1] Vigil asserts that the ALJ erred by describing the burden shift that applies in initial determination cases as applicable to her termination of benefits review. (Doc. 23 at 5 (citing AR 772).) It is clear that no burden shifting occurs in the continued disability review process, and this was an erroneous statement. However, Vigil has not asserted that harm flowed from the ALJ's misstatement, so I find that any error was harmless and is not a basis for remand. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

medical improvement and whether the improvement is related to the claimant's ability to do work.[2] *Id.* If there is medical improvement related to work ability, the ALJ evaluates the severity of the claimant's combined impairments and re-assesses the claimant's residual functional capacity ("RFC"). *Id.* Assuming the ALJ deems the impairments severe, the final two steps require the ALJ to apply the RFC in order to determine whether the claimant can return to past work and, if not, whether the claimant, considering his age, education, and past work experience, can do other work. *Id.*

**FACTUAL BACKGROUND**

Vigil, a thirty-two year old man with less than a full high-school education, was deemed disabled by the SSA at age nine. (AR 769.) His disability was reevaluated after he turned eighteen, and an ALJ determined that he remained disabled due to scoliosis, chronic pain, developmental delay, learning disability, panic disorder, personality disorder and depression. (AR 48-52.) But, as of April 1, 2005, the Commissioner found that his disability had ended and terminated his benefits.[3] (AR 769.) Vigil asserts that the Commissioner has not met his burden to demonstrate that he medically improved and is capable of performing work existing in the national economy despite his impairments. (Doc. 23.) He has also filed new applications for Supplemental Security Income and Disability Insurance Benefits based on the same impairments. (*See* AR 19, 363, 770.)

Even though Vigil has a lengthy history of receiving benefits, his medical records are relatively sparse. He has received treatment only from one physician and one chiropractor over the

---

[2] Even where there is no medical improvement or the improvement is not related to the ability to do work, the evaluation may continue if an enumerated exception applies. 20 C.F.R. §§ 404.1594(f)(5), 416.994(b)(5)(iv).

[3] For an unexplained reason, the ALJ decision that is now before me found that Vigil's disability ended one day later, on April 2, 2005. (AR 771.)

years, and he has been admitted to the hospital on a few occasions.[4] (*See, e.g.*, AR 593-94.) The records from Vigil's physician, Donald Hassemer, M.D., indicate that Dr. Hassemer has treated Vigil for chronic anxiety and abdominal pain. (AR 686.) Dr. Hassemer treated Vigil through prescription medications: Xanax for anxiety and Pepcid for abdominal pain. (*See* AR 622-31, 677, 684, 686.) Dr. Hassemer's findings will be discussed in detail below, but he has opined both that Vigil is actually disabled due to his abdominal pain and chronic panic attack anxiety disorder and stated that both issues are under control with the medication. (*See, e.g.*, AR 628, 630.) The chiropractor saw Vigil for lower back, neck and shoulder pain briefly in January 2006, for a few months in late 2006 and early 2007, and then once in January 2008. (AR 888-91.) He offered no opinion on the severity of Vigil's condition or Vigil's ability to function.

Vigil has been examined, evaluated and/or assessed by several doctors over the years, mostly at the behest of the SSA but also on his own. The following is a brief summary of each assessment:[5]

1. February 25, 1998 psychiatric assessment by Robert Hillman, M.D., found, after examination, an unspecified developmental disorder and an unspecified personality disorder, rated Vigil's Global Assessment of Functioning ("GAF") at 30, and opined that Vigil was severely and permanently disabled. (AR 190-92.)

2. March 11, 1998 disability evaluation by Leonore A. Herrera, M.D., addressed physical and emotional problems after examination and found support for claims of non-disabling pain as well as indications of psychological problems. (AR 193-96.)

3. April 20, 1998 psychological evaluation by Robert Krueger, Ph.D., concluded Vigil

---

[4] I will not review the hospital records because they are not relevant to the issues raised by the parties.

[5] Unless otherwise indicated, the examiner was retained by the SSA.

suffers from major depressive disorder (single episode), borderline intellectual functioning, and personality disorder and opined that Vigil has long-term, severe psychological problems with a GAF score of 45-50 based on an interview, examination, and intelligence test. (AR 234-37.)

4. June 28, 2004 mental status examination by Warren M. Steinman, Ph.D., relied on interview, previous assessments, and new mental status and intellectual functioning tests to diagnose recurrent and severe major depressive disorder, dysthymic disorder, and unspecified personality disorder with prominent schizoid features; Dr. Steinman indicated that panic disorder and learning disorder would need to be ruled out and suggested that Vigil would have difficulties with others, with detailed and complex instructions, and with arithmetic. (AR 718-26.)

5. August 25, 2005 disability determination examination by Michael Gzaskow, M.D. used interview and record review to diagnose general anxiety disorder, depressive disorder, personality disorder, learning disorder, scoliosis, chronic low back pain, and chronic gastrointestinal issues and set capability restrictions discussed in detail below. (AR 652-56.)

6. September 2, 2005 physical record review by Mary Z. Yoder, M.D., opined that physical impairments were not severe. (AR 650.)

7. February 26, 2008 psychological evaluation by John Lang, Ph.D., obtained by Vigil and based on interview, examination, and testing, diagnosed posttraumatic stress disorder, dysthymic disorder, panic disorder with agoraphobia, learning disability (dyslexia), dependent personality disorder, and back and shoulder pain; ranked Vigil's GAF at 50-55; and concluded that Vigil had experienced regression and

5

   needed therapy and psychoactive medications. (AR 740-43.)

8. August 14, 2008 letter from Dr. Lang, obtained by Vigil and written after a follow-up interview, found that Vigil's depression had become more severe, opined that Vigil is "incapable of coping with life[,]" and concluded that his condition is permanent and chronic. (AR 744.)

9. May 12, 2009 mental status examination by Dr. Steinman diagnosed dysthymic disorder, personality disorder with prominent schizoid and dependent features, and mild mental retardation based on an interview, examination, and intelligence testing; indicated panic disorder with agoraphobia and posttraumatic stress disorder needed to be ruled out; and concluded that Vigil needs socialization and therapy. (AR 929-39.)

10. June 1, 2009 disability determination examination by W. Murray Ryan, M.D., suggested that Vigil may experience some physical pain but concluded that his physical examination was otherwise normal and his primary allegations relate to psychological and learning issues. (AR 938-39.)

Beginning in 2000, Vigil secured a job with a biomedical appliance supplier, which he retained for two years. His work primarily entailed cleaning dialysis filters. (AR 583.) Then, in 2002, Vigil worked in the security department of a casino for one month and as a general laborer for Discount Tire Company for one month. (AR 583, 585.) In 2004, he was hired by Aaron's Furniture Store to deliver furniture, where he worked for approximately one year. (AR 584.) In each of these positions, Vigil indicated that he needed and received special help to complete his tasks and that he was in a sheltered work center. (AR 585.) He also indicated that each job allowed him to be almost entirely alone. (AR 588.)

At the most recent ALJ hearing, held on August 18, 2010, Vigil appeared with counsel, and the ALJ heard testimony from Vigil, Vigil's mother, and a Vocational Expert ("VE"). During the hearing, Vigil described experiencing anxiety, memory problems, back pain causing numbness, and difficulties getting along with others. (AR 968-77.) He stated that his typical day consists of getting up, showering, watching TV, calling his mother, going to his cousin's house next door or having his cousin over, and playing video games. (AR 972.) He explained the anxiety that he experienced during the hearing due to the number of the people in the room, stating that his hands were "sweating, dripping" (AR 969), and he eventually asked to leave the room. (AR 978.) His mother testified about Vigil's jobs and the ways she assists with his daily activities. (AR 979-82.) VE Mary Weber testified about jobs that would be available in the national economy based on hypothetical questions posed by the ALJ and Vigil's counsel. (AR 982-90.)

## ALJ DECISIONS

There have been multiple ALJ decisions in this case and there is an extensive procedural history. The last favorable decision by the SSA is very important in termination cases because it is the baseline from which the SSA determines whether the claimant has improved and whether the improvement is related to the ability to do work. In Vigil's case, the last favorable decision was issued by ALJ Richard Smith on July 25, 2000. (AR 52.)

ALJ Smith determined that Vigil, then twenty years old, continued to be disabled as an adult and therefore was entitled to ongoing benefits. (*Id.*) ALJ Smith found that Vigil had several severe impairments including "scoliotic rotation of the spine, hemihypertrophy of the chest wall, elevated scapula on the left side, chronic back and leg pain, developmental delays, a learning disability, a panic disorder, a personality disorder NOS, and depression." (AR 48.) Though he determined that Vigil's impairments did not meet or equal a listing, he did find that they rendered Vigil "unable to

7

perform even simple, unskilled work at all exertional levels." (AR 49.) While Vigil's physical impairments would only limit him to work at the medium level of exertion, the ALJ concluded that his depression, panic disorder, and impairments in cognitive and social functioning, as documented by all treating and consulting physicians aside from the Disability Determination Services' RFC paperwork, precluded Vigil from even simple, unskilled work. (AR 48-49.)

In 2005, the SSA reevaluated Vigil to determine whether he remained eligible for benefits and determined that Vigil was no longer disabled. (*See* AR 349-52.) Vigil appealed that decision (*see* AR 345) and also filed new applications for Disability Insurance Benefits and Supplemental Security Income (*see* AR 19, 368, 770). Ultimately, the appeal and new applications reached an ALJ and were combined. (AR 19.) The ALJ denied the appeal and applications in a decision upheld by the Appeals Council. (AR 7, 16.) Vigil appealed to the United States District Court, and the SSA moved to remand the case specifically to obtain additional testimony from a VE. *See Vigil v. Social Security Administration*, No. CV 09-372 JCH/GBW, Doc. 20 (D.N.M. Nov. 17, 2009). The case was remanded on November 20, 2009. *Id.* at Doc. 21.

On November 22, 2010, ten years after the last favorable decision, ALJ Ann Farris found that Vigil was no longer disabled because he made medical improvements in 2005 that rendered him capable of doing work at all exertional levels with a few nonexertional restrictions. (AR 769-81.) That decision was the final decision of the Commissioner, *see* 20 C.F.R. §§ 404.984(a) & (d); 416.1484(a) & (d), and it is the decision that Vigil now appeals.

ALJ Farris found that Vigil had not developed any new impairments and retained the same impairments that he had in 2000. (*Id.*) She reviewed the medical evidence, including the assessments and records from Drs. Hassemer, Hillman, Lang, Steinman, Gzaskow, and Ryan, as well as multiple residual functional capacity and psychiatric review technique forms completed by

8

the agency. (AR 774-76.) Based on her review, ALJ Farris concluded that Vigil made some medical improvement, though she did not specifically state which impairments had improved or how they had improved.

Next, ALJ Farris explained her conclusion regarding Vigil's RFC. (AR 776-78.) She stated that he can perform work at all exertional levels. (AR 776.) However, she did find that he is limited to a working environment where he makes only simple work-related decisions, experiences few workplace changes, has no interaction with the public and only superficial interaction with co-workers and supervisors, and performs no mathematical computations. (*Id.*) She referred back to the medical evidence as well as to the testimony from Vigil and his mother at the hearing. (AR 777.) ALJ Farris found that Vigil's statements about the severity of his symptoms lacked credibility because the treatment he received was relatively conservative and his "allegedly disabling impairments were present at approximately the same or higher severity level while working." (*Id.*) However, she also acknowledged that none of that work constituted substantial gainful activity. (*Id.*) She discounted Dr. Hassemer's statement that Vigil was disabled because his records did not support a finding of disability; in making that finding, she hypothesized that Dr. Hassemer made the statement because he sympathized with Vigil or because Vigil insisted that he make such a statement. (AR 778.) Finally, she found that the prescribed medications were effective in controlling Vigil's symptoms. (*Id.*) Because ALJ Farris found that Vigil's RFC allowed him to perform some work, she concluded that his improvement was related to the ability to work. (*Id.*)

Last, ALJ Farris concluded that Vigil could not return to his past work but that he could perform other work. (AR 778-79.) Despite his limited education, Vigil is young and can communicate in English. (AR 779.) ALJ Farris relied on the testimony of the VE, to whom she posed a hypothetical based on Vigil's stated RFC. (AR 780.) According to the VE, the hypothetical

individual with Vigil's characteristics and RFC could perform occupations such as linen room attendant, dishwasher, or cleaner. (*Id.*) These occupations exist in significant numbers in the national economy. (*See id.*) Thus, ALJ Farris found that Vigil was not disabled, and this decision became the final decision of the Commissioner.

## ANALYSIS

Vigil attributes three errors to the ALJ, each of which could require reversal of the Commissioner's decision and remand to the SSA.[6] First, he argues that the ALJ erred in finding that his medical condition had improved. (Doc. 23 at 22-24.) Next, he argues that the ALJ's RFC finding is unsupported by substantial evidence because: (1) the ALJ misconstrued the evidence related to his mental functioning, and (2) the ALJ's RFC finding failed to include all work-related limitations. (*Id.* at 10-22.) Finally, he asserts that the ALJ's determination that he could perform other work existing in the national economy was in error because: (1) the ALJ failed to consider the VE's responses to counsel's questions, and (2) the ALJ's conclusion that Vigil can perform substantial gainful activity is unsupported by the evidence. (*Id.* at 24-26.)

## I.     Medical Improvement

Medical improvement is defined by the governing regulations as "any decrease in the medical severity of . . . [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that . . . [the claimant was] disabled or continued to be disabled." 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). This requires the ALJ to look to the claimant's symptoms and/or laboratory findings, determine the severity of the claimant's current impairment(s),

---

[6] Vigil's brief is not structured in this manner and, consequently, neither is the SSA's. However, it is more logical to analyze the termination of benefits in the order of the sequential evaluation process. I have re-ordered Vigil's arguments accordingly.

and compare the severity of the current impairment(s) to the severity of the impairment(s) that were present at the time of the most recent favorable decision. *Id.*; *see also Shepard v. Apfel*, 184 F.3d 1196, 1201 (10th Cir. 1999). To satisfy the initial steps of the sequential evaluation process, though, medical improvement alone is insufficient. Instead, the medical improvement must relate to the ability to do work, meaning that the claimant's functional capacity to do basic work activities must have increased because of the improvement. 20 C.F.R. §§ 404.1594(b)(2), 416.994(b)(1)(ii); *see also Glenn*, 21 F.3d at 986.

Prior to addressing the basis for finding medical improvement, I am compelled to note that the medical improvement portion of the ALJ's opinion is seriously deficient. While ALJ Farris thoroughly described Vigil's medical records, she did not link that discussion to a comment on which of Vigil's numerous impairments had improved. A failure to state the specific areas of improvement renders it impossible for a reviewing court to evaluate the sufficiency of the evidence supporting the finding. *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) ( "In the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant evidence adequately supports the ALJ's conclusion . . . ."). Particularly when the SSA bears the burden, such a significant omission cannot be overcome easily. However, in this case, ALJ Farris stated in the RFC section of her opinion that Dr. Hassemer's records show that medications (referring presumably to Xanax and Pepcid) have been effective in controlling Vigil's symptoms (presumably those related to abdominal pain and anxiety). (AR 778.) Luckily for the SSA, it need only show some degree of medical improvement to one impairment in order to continue the analysis. *See* 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). However, this deficiency should be corrected on remand.

The evidence supports the conclusion that Vigil's abdominal pain improved. However, the

SSA has never included abdominal pain as one of Vigil's impairments. Thus, this does not support the ALJ's finding of medical improvement related to the ability to do work.

Dr. Hassemer's records also support the ALJ's conclusion that Vigil's anxiety improved.[7] Beginning on March 8, 2004, Dr. Hassemer stated that Vigil had "[c]hronic anxiety for [sic] which he suffers panic attacks and takes Xanax two mg. two or three times a day . . . ." (AR 686.) In July 2004, Vigil's next follow-up appointment regarding his anxiety, Dr. Hassemer stated that his "chronic pain [sic] attack anxiety disorder has been pretty well controlled . . . ." (AR 630.) Again in October 2004, Dr. Hassemer stated that Vigil's "panic attacks are now well controlled with Xanax . . . ." (AR 677.) The next month, Vigil went in to see Dr. Hassemer about his anxiety, and Dr. Hassemer stated that the anxiety attacks "are actually quite stable." (AR 629.) In January 2005, Dr. Hassemer again opined that Vigil's anxiety and panic attacks are "pretty well controlled with his Xanax." (AR 628.) In February of that same year, Vigil continued to display no anxiety, resulting in Dr. Hassemer's conclusion that Vigil "is calm with his Xanax . . . ." (AR 627.)

The conclusion that Vigil's anxiety had improved by April 1, 2005 is not contradicted elsewhere in the record. The other doctors who evaluated Vigil in 2004 and 2005 did not opine on the severity of Vigil's anxiety.[8] Dr. Gzaskow referred to "episodic anxiety" as part of the reason Vigil has trouble relating to others. (AR 656.) Dr. Steinman did not mention anxiety in his conclusions, though he did diagnose "Rule out . . . Panic Disorder (by history)." (AR 721-22.)

---

[7] It is surprising and somewhat troubling that the last record that the SSA has from Dr. Hassemer is dated February 21, 2006 when it is clear that Vigil continued to receive treatment from Dr. Hassemer at least through 2009. (*See* AR 622, 625-31, 677, 684-86, 861.) However, Vigil did not raise this as an issue, and the treatment notes that are included in the record support the ALJ's finding of medical improvement as of April 1, 2005.

[8] These doctors did diagnose other impairments and found that Vigil's functioning was limited as a result, but their conclusions were not based on Vigil's anxiety.

Some of the records from Dr. Hassemer could constitute evidence pointing toward the opposite conclusion. For example, two of Dr. Hassemer's records, those from June 2005 and February 2006, indicate that Vigil continued to struggle with anxiety attacks. (AR 622, 626.) Dr. Hassemer also opined more than once that Vigil is disabled. (*See* AR 627, 630.) While an ALJ ordinarily must defer to the medical opinion of a claimant's treating physician regarding the severity of impairments and the claimant's functional abilities, the ALJ, not the physician, is charged with deciding the ultimate issue of whether the claimant is disabled. *See* 20 C.F.R. § 404.1527(e)(1), 416.927(e)(1); SSR 96-5p, 1996 WL 374183, at *2-3. Dr. Hassemer's statement that Vigil is disabled is, accordingly, not determinative. Notwithstanding the evidence to the contrary, the ALJ's conclusion is supported by substantial evidence, and I may not reweigh the evidence. *See Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994).

The ALJ's finding that the severity of Vigil's anxiety disorder decreased is supported by substantial evidence; consequently, I find no error at the first steps of the sequential evaluation process.

## II. Consideration of the Evidence in the RFC Determination

A claimant's RFC represents what he can still do despite his limitations, *see* 20 C.F.R. §§ 404.1545(a), 416.945(a), and the RFC assessment has a significant impact on the remaining steps in the sequential evaluation. This important determination is left to the ALJ, but the ALJ does not have entirely free reign in making the decision. In making the RFC determination, the ALJ is required to evaluate all of the relevant evidence in order "to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." *Carpenter v. Astrue*, 537 F.3d 1264, 1269 (10th Cir. 2008) (quoting 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1)) (emphasis omitted) (alteration in original).

13

In the written decision, the ALJ's discussion should demonstrate that she considered the entire record but need not analyze every piece of evidence ad nauseam. *Clifton,* 79 F.3d at 1009-10. Because the ALJ must consider the whole record, she is prohibited from picking and choosing "among medical reports, using portions of evidence favorable to . . . [her] position while ignoring other evidence." *Carpenter*, 537 F.3d at 1265 (quoting *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004)). When there are multiple opinions regarding medical severity and functional ability from different sources, the ALJ must explain the weight given to each source's opinions and the reasons therefor. *Hamlin*, 365 F.3d at 1215 (citing 20 C.F.R. § 416.927(f)(2)(ii)).

In this case, the ALJ failed to properly consider all of the relevant evidence in crafting her RFC determination. Certainly, the ALJ summarized all of Vigil's evaluations and medical records from both treating and non-treating sources. The ALJ also explained the weight she gave to the opinion of each source. However, the ALJ discredited one source's opinions for impermissible reasons. She also ignored work-related limitations set out in the opinions to which she gave great weight.

Vigil's first argument stems from the fact that the ALJ gave little to no weight to Vigil's most recent psychological assessments.[9] (Doc. 23 at 10, 16-18.) The ALJ gave little weight to Dr. Lang's 2008 assessment and letter because: (1) there was no treatment relationship, and (2) the assessment was completed to generate evidence for Vigil's appeal rather than to seek treatment. (AR

---

[9] Vigil asks me to find that the ALJ's assessment of Vigil's ability to maintain concentration, persistence and pace was unsupported by substantial evidence. (Doc. 23 at 10.) However, this argument is premised on the ALJ's discussion of whether Vigil's impairments meet or equal a listing, and Vigil does not contest the ALJ's finding that his impairments do not meet a listing. Furthermore, the evidence supporting Vigil's argument is drawn from the most recent evaluations. Because I conclude that the ALJ erred by affording little weight to these opinions, the ALJ must reconsider them on remand and will therefore be forced to reevaluate her finding regarding Vigil's concentration, persistence and pace.

774-75.) Though she found that Dr. Lang's evaluation was "certainly legitimate" and deserved "due consideration," she further stated that "the context in which it was produced cannot be entirely ignored." (AR 775.)

The regulations explain how the SSA will evaluate medical opinions. *See* 20 C.F.R. §§ 404.1527 ("Regardless of its source, we will evaluate every medical opinion we receive. . . . [W]e consider all of the following factors in deciding the weight we give to any medical opinion. . . . (1) Examining relationship[;] . . . (2) Treatment relationship[;] . . . (3) Supportability[;] . . . (4) Consistency[;] . . . (5) Specialization[; and] . . . (6) Other factors."). Dr. Lang's opinion certainly is a medical opinion and must be evaluated according to the relevant factors. Of course, as the ALJ noted, Dr. Lang is not a treating source. *See* 20 C.F.R. §§ 404.1502, 416.902. However, Vigil has not received any medical treatment for his impairments aside from anxiety and pain, so there are no treating source opinions discussing the majority of Vigil's impairments. The only reason, then, that the ALJ rejected Dr. Lang's opinion was because it was a consultative examination obtained by the claimant rather than the agency.[10]

Logically, a claimant should be free to obtain an outside examination just as the agency is, especially where the claimant has not been treated for the impairment at issue. As logic dictates, it is clearly established law that an ALJ cannot automatically reject a medical, consultative opinion simply because it was obtained by the claimant. *Hinton v. Massanari*, 13 F. App'x 819, 824 (10th Cir. 2001) (unpublished) ("An ALJ may certainly question a doctor's credibility when the opinion, as here, was solicited by counsel. . . The ALJ may not automatically reject the opinion for that

---

[10] The ALJ's conclusion that Vigil sought out Dr. Lang's opinion solely to provide additional evidence for his social security claim is somewhat suspect because all of the available evidence indicates that Vigil went to Dr. Lang at the request of his mother for evaluation and possible treatment. (*See* AR 743, 970.)

reason alone, however."); *see also Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000); *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998). This error requires that the Commissioner's decision be reversed. On remand, the ALJ shall evaluate Dr. Lang's opinion according to the factors set out in the regulations rather than outright rejecting it because it was obtained by Vigil.

At this point, it is worth noting that, because the ALJ improperly rejected Dr. Lang's opinion, did not credit Dr. Steinman's 2009 evaluation, and did not obtain recent records from Dr. Hassemer, the ALJ had no evidence of Vigil's current functioning on which to base the RFC determination. Particularly with regard to mental illness, an individual's level of functioning is not stable and consistent. Indeed, the functioning of an individual with a mental illness is expected to fluctuate over time. *See* Sarah E. Dunn, *Mental Block: The Challenges Awaiting a Mentally Impaired Claimant when Applying for Social Security Disability Benefits*, 22 REGENT U. L. REV. 453, 460-61 (2009-10). The likelihood that Vigil's nonexertional impairments would change over time renders it problematic for the ALJ to rely solely on treatment records and non-treating medical source opinions from 2004-2006, particularly when more recent records evidencing symptomatic regression exist. (*See, e.g.*, AR 626 ("[H]e has had a return of the panic attacks."); AR 743 ("Mr. Vigil has experienced some regression . . . .").)

Vigil's second argument, that the ALJ failed to credit his treating physician's opinion that he was completely disabled (Doc. 23 at 11-16), does not justify relief. I have already examined Dr. Hassemer's records and found that they supported the ALJ's findings regarding the improvement to Vigil's anxiety. Furthermore, I found that the ALJ was not required to find Vigil disabled simply because Dr. Hassemer stated that he was. The ALJ noted Dr. Hassemer's opinion but found that it was not supported by the record. (AR 778.) The ALJ's assessment complied with the relevant law, regulations, and policy statements. *See* 20 CFR §§ 404.1527(e), 416.927(e); SSR 96-5p, 1996 WL

374183, at *2-3.

Vigil's third argument is based on the fact that the ALJ omitted functional restrictions described in medical opinions even though she afforded those opinions substantial weight. (Doc. 23 at 18-22.) The ALJ assigned significant weight to the opinions of Dr. Steinman in 2004 and Dr. Gzaskow. (AR 775-76.) However, each opinion included conclusions that the ALJ omitted in her RFC finding without explanation. These conclusions related to Vigil's ability to relate to co-workers and supervisors, to the nature of the environment in which he could work, and to his ability to handle work on a sustained and consistent basis.

Dr. Steinman found that Vigil's "lethargy, depression, and bitterness may prove unpleasant to employers and coworkers" and that he is "socially detached and inept." (AR 722.) Dr. Gzaskow stated that Vigil "has a difficult time relating to others," "can understand and follow directions only in a very simple/structured environment," and "[i]ndicates he continues not to be able to withstand the stress and pressures associated with day-to-day work . . . ."[11] (AR 656.) Despite the substantial weight that the ALJ afforded to the opinions of Drs. Steinman and Gzaskow, these limitations do not appear in Vigil's RFC. In fact, the nonexertional limitations placed on his workplace environment were that he can make only simple decisions and experience few workplace changes. (AR 776.) The sole limitation related to co-workers and employers was that Vigil may have only superficial interactions with co-workers and supervisors. (*Id.*)

Previous courts have faced this same problem. In *Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007), an ALJ's decision was reversed because the ALJ incorporated three restrictions from the

---

[11] The Commissioner's argument that Dr. Gzaskow did not intend his finding regarding Vigil's ability to handle the stresses and pressures of daily work as a limitation (Doc. 24 at 11) is an impermissible post-hoc rationalization. *See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). Furthermore, that contention is belied by Dr. Gzaskow's placement of the finding under the "Capability" heading of his report. (AR 656.)

examining doctor's opinion in the RFC but omitted four restrictions from that same opinion without explanation. In this case, like in *Haga*, the ALJ adopted some of the restrictions set by Drs. Gzaskow and Steinman while rejecting other restrictions that they set without explanation. It is simply unexplained why the restrictions were omitted.

The omission of restrictions related to Vigil's ability to deal with supervisors and co-workers and to function in a competitive work environment was not harmless. The SSA recognizes each of these areas as work-related mental activities generally required by competitive, remunerative work. SSA 96-8p, 1996 WL 374184, at *6. In an advisory opinion, the SSA stated that "[w]ork-related mental activities generally required by competitive, remunerative work include the abilities to: . . . respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id.* The VE's testimony, which the ALJ accepted (AR 780), further demonstrates that the omission of these limitations was harmful. In response to counsel's questions, the VE explained that a very simple and structured environment constituted a setting in which very basic instructions are provided, very basic tasks are assigned, and the tasks are repetitive. (AR 986.) She further stated that if special supervision was required, employment might be considered supportive rather than competitive. (*Id.*) Finally, she stated that if a person had difficulty accepting instructions and responding appropriately to criticism from supervisors, it would be difficult for him to maintain or continue employment. (AR 988.)

On remand, the ALJ must evaluate these limitations. If she determines that Vigil is not limited in his ability to accept direction and supervision and/or his ability to work on a daily basis in a competitive environment, she must explain her reasons for reaching that decision. If, on the other hand, she finds that Vigil is limited in either of these areas, additional testimony from a VE could be warranted.

Because the Commissioner's decision must be reversed and remanded due to the ALJ's errors in evaluating Vigil's RFC, I will not consider Vigil's arguments related to the ALJ's determination that he could perform other work.

## CONCLUSION

For the reasons stated above, Vigil's motion to reverse or remand (Doc. 23.) is granted, the decision of the Commissioner is reversed, and th is matter is remanded for proceedings consistent with this Order.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge